James B. LANG et al., Appellants,

v.

INTERNATIONAL PHOTO ENGRAVERS
UNION OF NORTH AMERICA
et al., Appellees.

Court of Appeals of Kentucky.

Nov. 4, 1960.

Rehearing Denied March 17, 1961.

Blakey Helm, Frank E. Haddad, Jr., Louisville, for appellants.

Edward Davis, Philadelphia, Pa., Herbert L. Segal, Louisville, for appellees.

PALMORE, Judge.

This action seeks a declaratory judgment to the effect that individual participation in a pension program adopted by the International Photo Engravers Union of North America (hereinafter called the union) is voluntary and not compulsory on the members of the union. It was brought by the appellants, journeyman members of the union belonging to its Local Union No. 30 at Louisville, who sued for themselves and all other members of the union opposed to the enforcement of the pension plan on a compulsory basis, against the union and the individuals constituting the officers of the local union.

The trial court entered a judgment adverse to the plaintiffs, determining that the pension plan is compulsory and sustaining the validity of enabling amendments to the union's constitution. They appeal.

Basically, the plan in question provides full retirement benefits for all union members who have attained the age of 65 years, have been members of the union for 10 years or more, and have been covered by the plan for 5 years or more. Partial benefits are provided for those who reach the retirement age but have less than 10 years' membership or less than 5 years' coverage. The plan embraces disability benefits as well. Only first-year apprentices are excluded from the program. The cost per month to each individual member is $10 for journeymen and advanced apprentices, $5 for fifth and fourth year apprentices, and $2.50 for third and second year apprentices.

The union has an annual convention of delegates elected from the local unions. At the 1956 convention in Montreal the executive council (governing body of the union) was instructed to make a study of pension plans and submit a proposal to the 1957 convention. Accordingly, such a proposal was submitted to the 1957 convention at Philadelphia in the form of a document entitled "Pension Program Specifications," which was unanimously approved by the delegates. This document, though not introduced in the form of a constitutional amendment, necessarily required certain

changes in the union constitution, particularly with respect to (1) the powers of the executive council, so as to enable it to contract for and arrange the administration of the program, and (2) an increase in dues to cover the cost to the individual members (assuming, of course, compulsory participation). Specific enabling amendments were thereafter prepared by or at the instance of the executive council and were submitted to a referendum vote of the entire voting membership of the union, preceded by a thorough educational campaign in which various representatives of the union explained the program at the local level. Some 87% of the union's total voting membership of 16,400 balloted on the proposition, 8,409 for and 5,911 against. The January 1, 1958, printed edition of the union constitution reflected the changes made by the enabling amendments approved in the referendum.

At the 1958 convention in New Orleans the officers of Local Union No. 30, in their capacities as delegates, proposed a resolution recognizing the pension plan to be compulsory and placing it instead on a voluntary basis. The proposition was defeated by a vote of the convention adopting an unfavorable committee report.

As expressed in the very lucid findings of fact and conclusions of law entered by the chancellor, "The core of this controversy is whether the constitution was properly amended." We agree with his judgment that it was.

Appellants contend that the "Pension Program Specifications" approved by the 1957 convention did not call for compulsory participation in the plan and that, in any event, the actual constitutional amendments thereafter submitted to a referendum of the union membership had not been adopted or initiated by the convention and could not be made effective by the referendum alone. It is not seriously argued that the members were not fully and fairly apprised of the compulsory feature of the plan by the time of the referendum.

The "Pension Program Specifications" outlined the proposed pension plan, including the cost to each member, very clearly and comprehensively. Though it was not stated in so many words that participation would be automatic or compulsory, that seems to be the only reasonable inference that could have been drawn from the contents of the document. For example, the very first paragraph provided as follows:

> *"Eligibility for Pension Benefits.*
>
> "All members will be eligible for pension benefits provided they have 10 years of membership at retirement."

The words "members" and "membership" as used throughout the outline clearly refer to membership in the union rather than membership in the pension program. This distinction between membership and coverage is illustrated, for example, in the paragraph relating to reduced benefits, wherein it is provided that those members of the union "who have had years of membership *or* years of *coverage* less than that required for normal benefits will receive prorated monthly benefits," etc. (Italics added.) With that understanding, the statement that *all members* will be eligible for pension benefits has unmistakable significance. That all members are eligible for the benefits presupposes that all members are participating. Otherwise all would be covered regardless of whether any of them had elected to contribute. But how could all of the members of the union be covered and entitled to the benefits of the pension plan if only some of them (or even none of them) were participating? The answer, of course, is that it would not be possible under any plan supported by contributions of the participants.

Had the "Pension Program Specifications" provided that all *participating* members would be eligible to benefits, or that all members would be eligible to participate, or eligible for coverage, there would certainly be a strong argument that the

1957 convention did not approve a compulsory plan, but as it was written we are of the opinion that it must be construed otherwise.

The authority for amending the constitution of the union is contained in Article V of that instrument. Section 5 of Article V, though it has received some attention in this case, applies only to amendments proposed by local unions and is not involved. Section 3 of Article V reads as follows:

"Sec. 3. The convention of the International Photo Engravers' Union shall have the power to amend the Constitution, General Laws and Resolutions, provided that any amendment which has for its purpose the removal of any existing law which requires reference to a vote of local unions or the individual members can only become effective when approved by a referendum vote. All legislation in which an increase of taxation, the increase of the minimum or maximum limitations placed upon the Defense Fund, or International Officers' salaries is proposed must be submitted to a referendum vote of the individual members. The convention may refer all other legislation it deems expedient for final action to all local unions."

■ We construe the foregoing section as vesting the power to amend the constitution in the convention, subject to referendum in certain specified instances (which include any increase in dues). We do not believe it can be fairly construed as authorizing an amendment solely by vote of membership, independent of any approving action by the convention. The word "referendum" itself implies a reference from one to another and excludes the idea of an amendment by initiative. In this we agree with the appellants. However, it is to be noted that there is nothing in the language of the constitution requiring an amendment to be approved by the convention in form as well as in substance. Certainly that would be the wisest and best procedure, in order to avoid misunderstanding and litigation, but it is not in fact required by the constitution. It is our opinion that by adopting the "Pension Plan Specifications" the convention approved in substance whatever constitutional changes a compliance with those specifications made necessary. In such a case the test of the final product is whether the form to which the legislation was reduced, and in which it was submitted for final approval by the whole membership of the union, fairly and accurately followed and was required by the substantive action of the convention.

■■ The five amendments as formally drafted and submitted to the referendum following the 1957 convention satisfy the test. Aside from increasing the dues to cover participation in the pension program they merely authorize the executive council to provide or contract for a "Pension-Welfare Plan" and to create a trusteeship to purchase and administer such a plan. Moreover, if it were at all doubtful as to whether the amendments exceeded or deviated from the substance of the proposition approved by the 1957 convention, we should be inclined to say that the defect was ratified by the action of the 1958 convention.

On the whole case it is our judgment that the procedure in adopting the disputed amendments achieved substantial compliance with the requirements of the union constitution. This judgment is fortified by the principle that the courts will not interfere with the interpretation placed by the union itself on its constitution and by-laws, so long as it is fair and reasonable. Norfolk & W. R. Co. v. Harris, 1935, 260 Ky. 132, 84 S.W.2d 69; 4 Am.Jur. 459 (Associations and Clubs, § 6); 87 C.J.S. Trade Unions § 13, p. 776. Weber v. Marine Cooks' & Stewards' Association of Pacific Coast, 1949, 93 Cal.App.2d 327, 208 P.2d 1009, cited by appellants, is distinguished by the failure in that case to follow specific

procedural requirements, whereas here we find no actual violation of any provisions embraced in the compact between the union and its members.

■ The chancellor was of the opinion that the referendum was the vital factor in the democratic process of amending the constitution, that the membership understood the issue on which it was voting, that the election was fair, and that the result represented the will of the majority, democratically expressed and binding upon all. In all of this his conclusions are amply supported by the record.

■ We construe the judgment as meaning that an amendment to the union constitution can be effected by referendum when the substance of it has been approved by the convention, and that the amendments in question were so effected. Thus construed, the judgment is affirmed.